# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

FULL CIRCLE DAIRY LLC

        Plaintiff,

vs.                                Case No. 3:06-cv-159-J-32MCR

RUEL R. MCKINNEY, II, and
RUEL MCKINNEY

        Defendants.

_____

## ORDER[1]

      This case is before the Court on cross motions for summary judgment.  Plaintiff,

Full Circle Dairy LLC ("plaintiff"), filed a Motion for Partial Summary Judgment.  (Doc.

68).  Defendants, Ruel R. McKinney, II, and Ruel McKinney ("defendants")[2], filed a

Motion for Summary Judgment. (Doc. 71).  Plaintiff responded to defendants' motion

(Doc. 74); defendants responded to plaintiff's motion (Doc. 80).  Plaintiff also filed a

reply to defendants' response to plaintiff's motion for summary judgment.  (Doc. 83).

The Court heard oral argument on November 7, 2006, the transcript of which is

_____

    [1]    Under the E-Government Act of 2002, this is a written opinion and therefore is available electronically.  However, it has been entered only to decide the motions addressed herein and is not intended for official publication or to serve as precedent.

    [2]    The parties stipulate that for purposes of resolving these cross motions for summary judgment, the Court may consider the defendants collectively and need not determine any issues relating to the identity of the individual(s) with whom plaintiff actually contracted.  (Doc. 69, p. 1).

incorporated by reference.

## I.    BACKGROUND AND STIPULATION OF FACTS

The parties submitted a Joint Stipulation of Material Facts (Doc. 69) to facilitate the resolution of the cross motions for summary judgment. Rather than recapitulate the facts and exhibits that comprise the stipulation, the Court incorporates the stipulation by reference.

This dispute arises out of the construction of a multi-million dollar fully functional dairy facility in Madison County, Florida. Under the Agreement between the parties, defendants were required to construct for plaintiff commodity barns, a mechanic's shop, a fuel depot, a milking center, four barns and two travel lanes. Defendants were not required to clear or excavate the land or install electrical wiring, water lines, plumbing fixtures, telephone lines, air conditioning, heating or ventilation systems. A dispute arose during construction, which resulted in plaintiff terminating the Agreement. This occurred after plaintiff paid defendants approximately 1.4 million dollars for work performed. There is a companion case in Circuit Court in Madison County, Florida, in which defendant Ruel McKinney II seeks to foreclose a $900,000 lien concerning the job at issue here. The parties ask this Court to resolve the issues presented in the cross motions in the hope that it will facilitate a resolution of both actions.

## II.    STANDARD OF REVIEW

Summary judgment is proper where "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "The burden of demonstrating the satisfaction of this standard lies with the movant, who must present pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that establish the absence of any genuine material, factual dispute." Branche v. Airtran Airways, Inc., 342 F.3d 1248, 1252-53 (11th Cir. 2003) (internal quotations omitted).  An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-250 (1986).  In determining whether summary judgment is appropriate for either party herein, the Court must draw inferences from the evidence in the light most favorable to the nonmovant and resolve all reasonable doubts in that party's favor. See Centurion Air Cargo, Inc. v. United Parcel Serv. Co., 420 F.3d 1146, 1149 (11th Cir. 2005).

## III.   DISCUSSION

### A.    Whether defendants were required to hold a construction license

Plaintiff's main assertion is that because defendants performed the construction work without a proper license, section 489.128(1), Florida Statutes, precludes them from seeking legal or equitable relief.  The threshold inquiry is whether defendants were required to have a license for the type of work they performed under the

Agreement.

Fla. Stat. § 489.128(1)(a) codifies Florida's licensure requirements, and provides, in pertinent part:

> For purposes of this section, an individual is unlicensed if the individual does not have a license required by this part concerning the scope of the work to be performed under the contract. …For purposes of this section, if no state or local license is required for the scope of work to be performed under the contract, the individual performing that work shall not be considered unlicensed.

Fla. Stat. § 489.105(3) sets forth the definition of "contractor" and provides in part:

> "Contractor" means the person who is qualified for, and shall only be responsible for, the project contracted for and means, except as exempted in this part, the person who, for compensation, undertakes to, submits a bid to, or does himself or herself or by others construct, repair, alter, remodel, add to, demolish, subtract from, or improve any building or structure, including related improvements to real estate, for others or for resale to others; and whose job scope is substantially similar to the job scope described in one of the subsequent paragraphs of this subsection.

There is a two pronged analysis to qualify as a "contractor".  First, the individual must "construct, repair, alter, remodel, add to, demolish, subtract from or improve" a structure; second, the individual who engages in such an undertaking must have a job scope that is "substantially similar" to a job scope described in subsections (a) through (q) of § 489.105(3), which includes "general contractor", "roofing contractor" and "specialty contractor".  Id.  The definitions of these terms are as follows:

-4-

"General contractor" means a contractor whose services are unlimited as to the type of work which he or she may do, who may contract for any activity requiring licensure under this part, and who may perform any work requiring licensure under this part, except as otherwise expressly provided in s. 489.113.

"Roofing contractor" means a contractor whose services are unlimited in the roofing trade and who has the experience, knowledge, and skill to install, maintain, repair, alter, extend, or design, when not prohibited by law, and use materials and items used in the installation, maintenance, extension and alteration of all kinds of roofing, waterproofing, and coating, except when coating is not represented to protect, repair, waterproof, stop leaks, or extend the life of the roof.

"Specialty contractor" means a contractor whose scope of work and responsibility is limited to a particular phase of construction and whose scope is limited to a subset of the activities described in the categories established in one of the paragraphs of this subsection.

Fla. Stat. § 489.105(3)(a)(e) & (q).

There is no dispute that defendants herein meet the first prong of the definition of "contractor". The dispute centers entirely around the second prong. Defendants assert that they were something less than general contractors, something more than roofing contractors, and thus specialty contractors (and not required to be licensed). Plaintiff asserts that defendants qualify as both general contractors and roofing contractors, and were required to be licensed.

### 1.    General Contractor

On this stipulated record, the undersigned finds that defendants do not qualify as general contractors. While defendants were hired to entirely construct (and did

construct significant portions of) the structural component[3] of the project, including the foundation, roofs and load bearing beams of the commodity barns, mechanic's shop, fuel depot, milking center and barns, see Fla. Stat. § 489.113(3)(a); (Doc. 69, Stip. at ¶¶ 5-6, 16), there is nothing in the stipulation or otherwise in the record establishing whether defendants:  (1) "are unlimited as to the type of work which [they] may do"; (2) "may contract for any activity requiring licensure under this part" (i.e., contracting for subcontractor work) or (3) "may perform any work requiring licensure."  Though the stipulation establishes that defendants built the structural components of the structures, the Court cannot find that defendants qualify as "general contractors" on this record.[4]

### 2.    Roofing Contractor

The parties' stipulation illustrates that defendants contracted to perform (and did perform) roofing work.  (Doc. 69, Stip. at ¶¶ 5-6, 16).  The photographs submitted with the stipulation show the rather extensive roofing work defendants performed. While the stipulation states that defendants reserved the right to argue that the

_____

[3]    "Structural component" means any vertical or horizontal load-bearing member of a structure which supports dead or live loads in addition to its own weight and includes, but is not limited to, a foundation, an exterior or interior load-bearing wall, a column, a column beam, a floor, and a roof structure.  Fla. Stat. § 489.105(15).

[4]    It may well be that on a more developed record, defendants would entirely satisfy the definition of "general contractor."  However, the Court is limited (by the parties' agreement) to this summary judgment record, which does not address the requisite factors.

coverings over the structures on the job at issue are not "roofs" (an argument that defendants did not press at the hearing), any such argument is unpersuasive. Under any common sense definition, the coverings on the job at issue clearly constitute "roofs."

Further, defendants construction of the roofs at issue illustrate that they possess the required experience, knowledge and skill to install a roof, thus performing work "substantially similar" to that of a "roofing contractor." Because it is undisputed that defendants constructed the extensive roofing, which was a key part of the project, and also satisfy the definition of "roofing contractor", defendants were "contractors" and thus required to be licensed. See Deep South Sys., Inc. v. Heath, 843 So. 2d 378, 380-81 (Fla. 2nd DCA 2003) (an entity's act of entering into contracts to install all roof, wall and soffit panels on a new building qualified it as a roofing contractor, and thus a contractor requiring a license, under § 489.105(3)); see also Terranova v. State, 474 So. 2d 1206, 1207-08 (Fla. 2nd DCA 1985) (denial of motion for judgment of acquittal and conviction affirmed where defendant performed work of a roofing contractor without a license when he received $1,250.00 for his services of cleaning gravel off the roof, applying sealant and felt to the roof and replacing portions of the roof).

### 3.   **Specialty Contractor**

Though the finding that defendants qualify as roofing contractors and were required to posses a license obviates the need to fully address defendants' position that they were specialty contractors, at least some discussion is necessary.  The Construction Industry Licensing Board's (the administrative agency that regulates the construction industry in Florida), see Fla. Stat. § 489.107, official website recapitulates § 489.105(3)(e)'s definition of "specialty contractor" and adds that "[s]pecialty contractors include Specialty Structure Contractors, Gypsum Drywall Contractors and Glass and Glazing Contractors."[5] [6]

Section 61G4-15.015 of the Florida Administrative Code, titled "Certification of Specialty Structure Contractors", provides that the scope of such work is "limited to fabric coverings on metal substructures, screened porches, screened enclosures, pool enclosures, preformed panel-post and beam roofs, manufactured housing roof-

---

[5]   Defendants assertion that they fall within the purview of a specialty contractor ostensibly means they are Specialty Structure Contractors.

[6]   Defendants ask this Court to take judicial notice under Fed. R. Evid. 201 of a document containing "frequently asked questions and answers" on the Construction Industry Licensing Board's official State of Florida web page.  The address of the official web page is www.myflorida.com/dbpr/pro/cilb/cilb_index.shtml.  There is a hyperlink on that page connecting to the FAQ document at issue.  Because the authenticity of the FAQ document is not in question and the facts upon which defendants seek judicial notice are capable of accurate and ready determination via this official State of Florida website (question 7 on page 3 of the FAQ document), the Court takes judicial notice that the following types of "specialty contractor" work are illustrative of those that do not require licensure under Florida law: cabinets, countertops, flooring, paint, wallpaper and window treatments.

overs, vinyl or acrylic window enclosures, guardrails, handrails, aluminum and vinyl fences...." Clearly, the Construction Licensing Board, via § 61G4-15.015, limits the class of work those designated as "specialty structure contractors" can perform without a license. Even under the most expansive reading of that section, the work defendants contracted to perform (the foundation, roofs and load bearing beams of the commodity barns, mechanic's shop, fuel depot, milking center and barns) cannot be classified as that of a specialty contractor. To hold otherwise would allow the specialty contractor exception to swallow the rule and permit unlicensed individuals to undertake significant construction projects in Florida simply by classifying themselves as "specialty contractors". Florida law does not permit this. See Fla. Stat. §§ 455.201 & 489.101.

**B.    Whether plaintiff "supervised" defendant under Fla. Stat. § 489.113(2)**

Defendants assert that if the Court characterizes them as general or roofing contractors, they nevertheless were not required to hold a license because they worked under plaintiff's supervision. Fla. Stat. § 489.113(2) provides, in pertinent part:

> No person who is not certified or registered shall engage in the business of contracting in this state. However, for purposes of complying with the provisions of this chapter, a person who is not certified or registered may perform construction work under the supervision of a person who is certified or registered, provided that the work is within the scope of the supervisor's license and provided that the person being supervised is not engaged in construction work which would require a license as a contractor under any of the categories listed in s. 489.105(3)(d)-(o).

Defendants' argument fails because the statute clearly requires that the supervisor (plaintiff) hold a license.  Plaintiff was not "registered", "certified" or "licensed".[7] [8]   Further, the Court's finding that defendants worked as roofing contractors, which is a category requiring licensure under § 489.105(3), precludes any claim that defendants were not required to be licensed under § 489.113(2).  See Deep South, 843 So. 2d at 380.

---

[7]   The seemingly interchangeable use of the terms certified, registered and license throughout Chapter 489, Florida Statutes, is somewhat confusing.  However, the following footnote from the Deep South decision sheds light on the interrelationship among these three terms:

> Florida law classifies construction contractors into two groups: certified contractors or registered contractors.  § 489.105(8), (10), Fla. Stat. (2001).  The two groups differ in the requirements for licensure.  See § 489.111, Fla. Stat. (2001) (setting out the requirements for certification licensure); § 489.117, Fla. Stat. (2001) (setting out the requirements for registration licensure).  A certified contractor may perform construction work anywhere in Florida, see § 489.113(1), Fla. Stat. (2001), while a registered contractor may only perform work covered by the registration in the county, municipality, or development district for which the registration applies, see § 489.117(1)(b).

843 So. 2d at 379, n.1.  While the referenced statutes have been amended since 2001, none of those amendments disturb the relationship among the terms "registered", "certified", and "license" as used in Chapter 489, Florida Statutes.

[8]   The parties even stipulate that "[d]efendants were not working under the supervision of anyone who was certified or registered in the State of Florida as those terms are used in Chapter 489 of the Florida Statutes."  (Doc. 69, Stip. at ¶ 14).

Therefore, defendants were required by law to be licensed and were not; they may not seek payment under the Agreement in an action at law. Fla. Stat. § 489.128(1)(a).

### C.     Whether an unlicensed contractor may seek equitable remedies

Defendants assert that even if the Court finds (as it has) that defendants were unlicensed contractors, and unable to prevail in an action at law to recover damages for a breach of contract, defendants may obtain equitable relief via a quantum meruit claim.  Fla Stat. § 489.128(1) provides, in pertinent part:

> As a matter of public policy, contracts entered into on or after October 1, 1990, by an unlicensed contractor shall be unenforceable in law or in equity by the unlicensed contractor.  (Emphasis added).

The parties agree that this statute precludes an unlicensed contractor from enforcing a construction contract via an action at law (i.e., breach of contract action). The dispute, which is apparently an issue of first impression under Florida law, is whether the statute precludes an unlicensed contractor from seeking equitable remedies.  Defendants' main argument is based on the wording of the statute and focuses on the word "unenforceable".  Defendants assert that the statute does not preclude equitable claims by an unlicensed contractor because, under common law, an aggrieved party cannot "enforce" a contract in equity; any such action to "enforce" a contract must be at law.

-11-

In undertaking this analysis, a discussion of the Florida Legislature's changes to § 489.128(1) is necessary.  In 1993, the Legislature, with Laws 1993, c. 93-166, § 17, amended § 489.128(1).  Prior to the 1993 amendments, § 489.128(1) read:

> As a matter of public policy, contracts entered into on or after October 1, 1990, and performed in full or in part by any contractor who fails to obtain or maintain his license in accordance with this part shall be unenforceable in law, and the court in its discretion may extend this provision to equitable remedies.  However, in the event the contractor obtains or reinstates his license, the provisions of this section shall no longer apply.  (Emphasis added).

While there have been other changes to § 489.128(1) since, the relevant changes occurred in 1993 with the addition of the words "or in equity" and the deletion of the phrase "and the court in its discretion may extend this provision to equitable remedies."[9]

Defendants submit that this change merely means that an unlicensed contractor is precluded from using defensive measures, such as equitable estoppel, to defend a contract claim.  One Florida court has declared, albeit in dicta, that the 1993 amendments to § 489.128(1) may not necessarily clear up the issue of whether an unlicensed contractor can proceed in equity.  See Sterner v. Phillips, 721 So. 2d

---

[9]    In 2000, the Florida Legislature amended § 489.128(1) by deleting "However, in the event the contractor obtains or reinstates his license, the provisions of this section shall no longer apply."  See Laws 2000, c. 2000-372, § 35.  Again, in 2003, the Legislature amended § 489.128(1) by adding the phrase "by the unlicensed contractor" immediately after the phrase "or in equity" at the end of the statute, meaning that only the unlicensed contractor (and not the owner) who seeks to enforce the contract (in law or in equity) is barred from doing so.  See Laws 2003, c. 2003-257, § 1.

450, 451 n. 2 (Fla. 5th DCA 1998) ("We do not decide whether section 489.128, Florida Statutes would preclude recovery of the value of the materials (at issue).... The original version of the statute appears to have been intended to give the court discretion to grant recovery in quantum meruit.  It provided that such contracts were unenforceable 'at law' but not in equity.  The current version of the statute denies enforcement 'in law or in equity.'  This imprecise language arguably does not answer the question").

Because <u>Sterner</u> notes that § 489.128(1) may not be entirely clear, this Court must discern the meaning of the statute by first looking to its actual language and then, if necessary, applying other rules of statutory construction to ascertain legislative intent. <u>See</u> <u>Freeman v. First Union Nat. Bank</u>, 865 So. 2d 1272, 1276 (Fla. 2004).  When the meaning of the "or in equity" language is parsed, especially in conjunction with the deletion of the phrase "and the court in its discretion may extend this provision to equitable remedies", it becomes apparent that the statute precludes unlicensed contractors not only from bringing an action at law, but also one in equity.[10]

The only legislative history the Court uncovered relating to the 1993 changes to § 489.128(1) came from the Florida House of Representatives, and provides:

---

[10]  Such a reading of § 489.128(1) furthers the prescribed legislative intent set forth in §§ 455.201 and 489.101, that regulation of the construction industry is necessary to protect the health, safety and welfare of Florida's citizens.

"Section 13 [a]mends section 489.128, Florida Statutes, to make unlicensed contracts unenforceable in equity as well as in law." <u>See</u> H.R. Comm. Bus. & Prog. Regulation, Final Bill Analysis, H.B. 2189.   While this language does not entirely address defendants' general argument that a claimant cannot seek to "enforce" a contract in equity, it leaves little doubt that the addition of the phrase "or in equity" was intended to bar unlicensed contractors from bringing equitable claims in those same situations where they are disabled from bringing actions at law.  Otherwise, the language has no real meaning.[11]

### D. Whether the prohibition against equitable claims in Fla. Stat. § 489.128(1) violates Article I, Section 21 (Access to Courts) of the Florida Constitution

Having now found that § 489.128(1) prohibits an equitable claim in quantum meruit in these circumstances, the Court turns to the issue of whether this proscription of equitable claims violates the access to courts provision in the Florida Constitution.  This apparently is an issue of first impression.  Article I, Section 21 of the Florida Constitution provides:

> The courts shall be open to every person for redress of any injury, and justice shall be administered without sale, denial or delay.

---

[11]   Defendants also rely on <u>Wood v. Black</u>, 60 So. 2d 15 (Fla. 1952) and <u>Duncan v. Kasim</u>, 810 So. 2d 968 (Fla. 5th DCA 2002), in support of their position.  The undersigned finds both <u>Wood</u> and <u>Duncan</u> distinguishable from the present case on this issue.

The seminal Florida case on the interpretation of the access to courts provision and its relationship to the abolishment of common law (and statutory) causes of action is <u>Kluger v. White</u>, 281 So. 2d 1 (Fla. 1973).  In <u>Kluger</u>, the Supreme Court held:

> [W]here a right of access to the courts for redress for a particular injury has been provided by statutory law predating the adoption of the Declaration of Rights of the Constitution of the State of Florida, or where such right has become a part of the common law of the State pursuant to Fla. Stat. S. 2.01, F.S.A., the Legislature is without power to abolish such a right without providing a reasonable alternative to protect the rights of the people of the State to redress for injuries, unless the Legislature can show an overpowering public necessity for the abolishment of such right, and no alternative method of meeting such public necessity can be shown.

281 So. 2d at 4.  The Supreme Court recapitulated the <u>Kluger</u> test in its more recent decision in <u>Mitchell v. Moore</u>, 786 So. 2d 521 (Fla. 2001), and noted that because the right of access is specifically mentioned in the Florida Constitution, it deserves more protection than those rights found only by implication.  <u>Id.</u> at 527.

To make a colorable claim of denial of access to courts, an aggrieved party must demonstrate that the Legislature has abolished a common law right previously enjoyed by people of Florida.  <u>Yachting Promotions, Inc. v. Broward Yachts, Inc.</u>, 792 So. 2d 660, 663 (Fla. 4th DCA 2001) (citations omitted).  Here, defendants properly point out that the Florida Supreme Court recognized a quantum meruit claim prior to the Declaration of Rights in the Florida Constitution.  <u>See</u> <u>Wood</u>, 60 So. 2d at 15, 16; <u>see also</u> <u>C.B. Jackson & Sons Const. Co. v. Davis</u>, 365 So. 2d 207, 208 (Fla. 3d DCA

-15-

1978) (relying on the Supreme Court's 1952 decision in <u>Wood</u> and holding the failure to follow the licensing procedure under Chapter 468, Florida Statutes - the predecessor to Chapter 489 - does not preclude an equitable cause of action even though it might subject the unlicensed contractor to certain other (criminal) penalties). Plaintiff interprets the Florida Legislature's amendments to § 489.128(1) as merely creating some procedural conditions (i.e. requiring a license) on a contractor's ability to proceed on equitable theories, and not entirely abolishing a claim, as is required under <u>Kluger</u>.[12]

---

[12] The Florida Supreme Court has considered at least four other situations concerning whether some procedural obstacle in a statute or rule rises to the level of the abolishment of a statutory or common law cause of action. <u>Compare</u> <u>Mitchell</u>, 786 So. 2d at 528 (Prisoner Indigency Statute's copy requirement violated inmate's constitutional right to access to courts because a prisoner's ability to obtain voluminous past pleadings and orders concerning prior cases to submit to a circuit court in conjunction with a writ of habeas corpus could only be accomplished with great difficulty, delay and public expense), <u>with</u> <u>Warren v. State Farm Mut. Auto. Ins. Co.</u>, 899 So. 2d 1090, 1097 (Fla. 2005) (statute relieving an automobile insurer of liability for no-fault benefits for treatment or services by a health-care provider more than thirty days before the postmark date of the statement of charges does not abolish medical providers' access to courts, rather it merely places a reasonable condition on filing a claim for certain insurance benefits); <u>Chapman v. Dillon</u>, 415 So. 2d 12, 17 (Fla. 1982) (limitations in Florida's no fault statute, § 627.737, provide a reasonable alternative to tort actions and do not limit access to courts); <u>Purdy v. Gulf Breeze Enterprises, Inc.</u>, 403 So. 2d 1325, 1327-28 (Fla. 1981) (sections 627.736(3) and 627.7372, which reduce the amount of damages an injured plaintiff can recover from tortfeasors by the amount of benefits received from collateral sources, do not violate the access to courts provision because there was no abolition of any previous right of access); <u>Bauld v. J.A. Jones Const. Co.</u>, 357 So. 2d 401, 402 (Fla. 1978) (amendments to statute of limitations and statutes of repose that merely restrict the time in which a litigant may file a claim do not abolish any right of access to courts, but merely create conditions under which that right may be exercised).

At first blush, plaintiff's position appears correct.  However, a closer study of Wood confirms that the Florida Supreme Court, in 1952 (which pre-dates the adoption of the Declaration of Rights of the Florida Constitution), fashioned a discrete equitable claim for "unlicensed" contractors to pursue.  The C.B. Jackson decision, issued twenty-six years later, follows Wood, albeit noting that the contractor's actions there "might subject it to certain other (criminal) penalties."  See C.B. Jackson, 365 So. 2d at 208.  Because this Court is of the view that the Supreme Court in Wood crafted a discrete equitable claim and that the amendments to § 489.128(1) entirely proscribe equitable claims by unlicensed contractors, it follows that, in enacting the 1993 amendments, the Florida Legislature abolished the equitable common law cause of action recognized in Wood that existed in Florida prior to the adoption of the Declaration of Rights of the Florida Constitution.  Thus, this Court must proceed under Kluger and determine whether: (1) the Legislature has shown an overpowering public necessity for the abolishment of this claim, and (2) there is any alternative method of meeting such public necessity.

Sections 455.201 and 489.101, Florida Statutes, set forth the legislative intent for the regulation of the construction industry (and other professions in the state of Florida).  Section 455.201 provides:

> (1) It is the intent of the Legislature that persons desiring to engage in any lawful profession regulated by the department shall be entitled to do so as a matter of right if otherwise qualified.

-17-

(2) The Legislature further believes that such professions shall be regulated only for the preservation of the health, safety, and welfare of the public under the police powers of the state. Such professions shall be regulated when:

(a) Their unregulated practice can harm or endanger the health, safety, and welfare of the public, and when the potential for such harm is recognizable and clearly outweighs any anticompetitive impact which may result from regulation.

(b) The public is not effectively protected by other means, including, but not limited to, other state statutes, local ordinances, or federal legislation.

(c) Less restrictive means of regulation are not available.

Fla. Stat. § 489.101 provides, "[t]he Legislature deems it necessary in the interest of the public health, safety, and welfare to regulate the construction industry."[13]

There is no Florida case discussing whether the language in sections 455.201 and 489.101 are sufficient to satisfy the Kluger requirement that the Legislature must show an overpowering public necessity for the abolishment of a cause of action (here, equitable claims by an unlicensed contractor). The Florida Supreme Court has, however, considered other statutes and whether the language therein (or that

---

[13] Prior to the 1979 amendments, § 468.101 (the predecessor statute to § 489.101 - the Legislature renumbered Chapter 468 to Chapter 489 in 1979) read:

It is hereby declared to be the public policy of the state that, in order to safeguard the life, health, property, and public welfare of its citizens, the business of construction and home improvements is a matter affecting the public interest, and any person desiring to obtain a certificate to engage in the business as herein defined on a statewide basis shall be required to establish his competency and qualifications to be certified as herein provided.

contained in a legislative preamble) met this requirement.  See University of Miami v. Echarte, 618 So. 2d 189, 196 (Fla. 1993) (Legislature's factual findings set out in the preamble of statutes creating caps on non-economic damages when the defendant in a medical malpractice case agrees to arbitration and the claimant declines and proceeds to trial satisfy the 'overpowering public necessity' prong of Kluger; the pertinent language is: [I]t is the sense of the Legislature that if the present crisis is not abated, many persons who are subject to civil actions will be unable to purchase liability insurance, and many injured persons will therefore be unable to recover damages for either their economic losses or their non-economic losses..." and "medical malpractice liability insurance premiums have increased dramatically in recent years, resulting in increased unavailability of malpractice insurance for some physicians."); Carr v. Broward County, 541 So. 2d 92, 94-95 (Fla. 1989) (the preamble to the 1975 Medical Malpractice Reform Act, which enacted a seven-year statute of repose for medical malpractice claims, satisfied the 'overpowering public necessity' prong of Kluger)[14]; see also American Liberty Ins. Co. v. West and

---

[14]   The legislative preamble to the statutes at issue in Carr is as follows:

> WHEREAS, the cost of purchasing medical professional liability insurance for doctors and other health care providers has skyrocketed in the past few months; and
>
> WHEREAS, the consumer ultimately must bear the financial burdens created by the high cost of insurance; and
>
> WHEREAS, without some legislative relief, doctors will be forced

Conyers, Architects and Eng'rs, 491 So. 2d 573, 574-75 (Fla. 2d DCA 1986) (preamble to statute of limitations for actions on the design, planning, or construction of improvements to real property satisfied Kluger); but cf. Nationwide Mut. Fire Ins. Co. v. Pinnacle Med., Inc., 753 So. 2d 55, 59 (Fla. 2000) (holding statute that required arbitration of disputes arising between medical provider assignees of PIP benefits and an insurer which precluded the medical provider from directly pursuing a breach of contract claim in court violated the access to courts provision of the constitution because the statute at issue did not provide any commensurate benefit and the Legislature did not show an overpowering public necessity for abolishing this right); Smith v. Dep't of Ins., 507 So. 2d 1080, 1089 (Fla. 1987) (holding section of the 1986 Tort Reform and Insurance Act that placed a $450,000 cap on non-economic damages for tort victims unconstitutional under Kluger and noting that the parties did not cite to the court that such a cap was based on a legislative showing of "an overpowering public necessity for the abolishment of such a right, and no alternative method of meeting such public necessity can be shown.")

―――――――――――――――――

> to curtail their practices, retire, or practice defensive medicine at increased cost to the citizens of Florida; and
>
> WHEREAS, the problem has reached crisis proportion in Florida, NOW THEREFORE...

Carr, 541 So. 2d at 94 (citations omitted).

-20-

Whether the Florida Legislature articulates sufficient findings relating to § 489.128(1)'s proscription of equitable claims to satisfy the "overpowering public necessity" prong of <u>Kluger</u> presents a difficult question.  While the Legislature made no additional contemporaneous legislative findings with the passage of the 1993 and 2003 amendments to § 489.128(1) proscribing equitable claims by unlicensed contractors, this Court finds persuasive the argument that §§ 455.201 and 489.101, when read together, satisfy the "overpowering public necessity" prong of <u>Kluger</u>. Sections 455.201 and 489.101 codify the Legislature's purpose in regulating professions in the State of Florida (of which the construction industry is one) and iterate that the Legislature finds it necessary in the interests of public health, safety and welfare to regulate the construction industry.  Reading these statutes together, it is apparent that the Florida Legislature is ardently concerned about the injurious effect that unlicensed contracting could have on the citizens of Florida.  Though this Court knows of no "magic words" that meet the "overpowering public necessity" test in <u>Kluger</u>, the undersigned finds that the legislative pronouncements in Fla. Stat. §§ 455.201 and 489.101 are sufficient.  Further, it cannot be ignored that what the Legislature seeks to address in § 489.128(1), the performance of unlicensed contractor work in Florida, is also a crime under Florida law.  <u>See</u> Fla. Stat. § 489.127.[15]

---

[15]   While defendants posit that the <u>Wood</u> and <u>C.B. Jackson</u> decisions recognize an equitable cause of action even in the face of criminal penalties thus requiring this

Similarly, there appears to be no "alternative method" that the Florida Legislature could employ to meet the "public necessity" (and defendants have suggested none).  If what the Legislature seeks is to prohibit construction work performed by unlicensed contractors in Florida, the statutory preclusion of all civil claims (legal and equitable) for an unlicensed contractor to be paid for such work is the obvious means to do so.  To preclude legal claims, but not equitable claims, merely encourages unlicensed contractors to masquerade their contract claims as equitable claims, thus vitiating the full deterrent effect that the Legislature seeks. Therefore, while conceding it is a close question, the Court holds that the prohibition of equitable claims in Fla. Stat. § 489.128(1) does not violate the access to courts provision in Article I, Section 21 of the Florida Constitution.

**E.     Whether any "legal" portions of the contract can be severed from the "illegal" portions.**

The final issue defendants raise is that if the Court finds that defendants were roofing contractors and not general contractors (as it has on this record), then only the unlawful portions of the contract (i.e., those portions involving "roofing" work) should be unenforceable and can be severed from the lawful portions.  Plaintiff asserts that the roofing portions of the contract cannot be severed from the remaining portions because the roofs are the essential components of the buildings at issue,

_____

Court to permit defendants herein to proceed, nothing in those cases foreclosed the Legislature (nor could they) from removing all causes of action from an unlicensed contractor, which the Legislature did with the amendments to § 489.128(1).

and without the roofs, plaintiff "would have nothing."  Under Florida law, "[a] bilateral contract is severable where the illegal portion of the contract does not go to its essence and, where, with the illegal portion eliminated, there still remain valid legal promises on one side which are wholly supported by valid legal promises on the other."  Gold, Vann & White, P.A. v. Friedenstab, 831 So. 2d 692, 696 (Fla. 4th DCA 2002) (citing Title & Trust Co. of Fla. v. Parker, 468 So. 2d 520 (Fla. 1st DCA 1985)).

While it is true that the essential purpose of the contract was to build completed structures, the Court is unable on this record to determine that of the roughly $900,000 in dispute, defendants are not entitled to remuneration for performing work that was not "illegal."  Because the Court has determined (on this record) that defendants only qualify as roofing contractors, it may be that they are entitled to compensation for non-roofing work that did not require a license.  Conversely, however, and as previously noted, a more developed record may show that the entire scope of defendants' work (i.e., the construction of the foundation, support beams and any walls for the buildings at issue) required licensure, and thus defendants are not entitled to any payment.[16]  Because the Court is unable to make these determinations based on the parties' stipulation and the current state of the record,

---

[16]  The Court understands that plaintiff paid defendants for roughly 1.4 million dollars worth of work on the project and that there is approximately $900,000 in dispute.  It is unclear (1) what work plaintiff's have paid for, (2) the work that underlies the $900,000 dispute and (3) what work plaintiff performed on its own to finish the job. On the current state of the record, the undersigned is not able to determine whether there are valid legal promises from both sides that ought to be enforced.

summary judgment is due to be denied to both parties as to what portions of the Agreement, if any, can be severed from the "illegal" portions of the contract (i.e., those portions relating to the construction of the roofs).

## IV.    CONCLUSION

For the foregoing reasons, this Court hereby holds:

a.    Defendants acted as roofing contractors under Fla. Stat. § 489.105(3)(e);

b.    Defendants were not supervised by a licensed contractor under Fla. Stat. § 489.113(2);

c.    Fla. Stat. § 489.128(1) precludes defendants from seeking legal and equitable relief for the roofing portions of the parties' Agreement; and

d.    The proscription against equitable relief for an unlicensed contractor under Fla. Stat. § 489.128(1) does not violate the access to courts provision in Article I, Section 21 of the Florida Constitution.

e.    Summary judgment will be denied to both sides on the severability issue.

Accordingly, it is hereby **ORDERED**:

1.    Plaintiff's Motion for Partial Summary Judgment (Doc. 68) is **GRANTED IN PART AND DENIED IN PART**.

2.    Defendants' Motion for Summary Judgment (Doc. 71) is **DENIED**.[17]

---

[17] Further, Defendants' Motion to Accept Late Filed Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment (Doc. 79) is **GRANTED**, and Defendants' Request for Judicial Notice (Doc. 81) is **GRANTED**.

3.      The undersigned understands from the parties' representations at oral argument that an Order on the issues presented in the cross motions would allow the parties to resolve this case.  No later than **December 20, 2006**, the parties shall file pleadings addressing whether there are any remaining issues requiring the Court's attention and, if so, a proposed schedule for doing so.  Further, so as not to invade the province of the Madison County Circuit Court, the undersigned declines to address how this ruling affects the state court foreclosure action.

**DONE AND ORDERED** at Jacksonville, Florida this 30th day of November, 2006.

TIMOTHY J. CORRIGAN
United States District Judge

t.
Copies: counsel of record

-25-